Argued February 17, reversed March 4, 1919.

# BRICE v. MT. SCOTT PARK CEMETERY CORP.

### (178 Pac. 935.)

Corporations — Sale of Bonds — Misrepresentation — Statement of Opinion.

1. Statements made by agent of corporation in sale of corporate bonds as to value of real estate owned by the corporation, and as to the value of stock given as bonus to bond purchasers, were mere expressions of opinion, and not representations of fact.

Corporations—Sale of Bonds—Misrepresentations—Sufficiency of Evidence.

2. In action against corporation to rescind sale of corporate bonds on ground of misrepresentation, evidence *held* insufficient to show that agent making sale so misrepresented the safety of the investment as to warrant a rescission of the sale.

Corporations—Sale of Bonds—Misrepresentation—Sufficiency of Evidence.

3. Evidence *held* insufficient to show that agent of corporation, in the sale of bonds of the corporation, made fraudulent statements as to sinking fund.

Corporations—Sale of Bonds—Misrepresentation—Ratification—Right to Rescind.

4. Purchaser of bonds on misrepresentation that they were secured by mortgage on the corporation's land, and that such land was not otherwise encumbered, who accepted interest on bonds and attended meetings of the stockholders for four years after notice that land was mortgaged, and who failed to immediately rescind sale upon learning that bonds were not secured by mortgage thereon, was not entitled to rescind the sale.

From Multnomah: GEORGE G. BINGHAM, Judge.

Department 1.

On October 31, 1911, the Mt. Scott Park Cemetery Corporation, through its agent H. R. Reynolds, sold and delivered to George Thomson two of its bonds, aggregating $1,000, and twenty shares of its capital stock of the par value of $25 per share. Thomson paid $1,000 for the bonds and stock. According to the testimony of Reynolds the twenty shares of stock were treated as a bonus. Each of the bonds obligates

the corporation to pay to George Thomson, or to the recorded owner at the expiration of twenty years from the date of the instrument, a stated principal sum together with interest at the rate of 6 per cent per annum. Coupons representing the interest due on the first day of January of each year are attached to the bonds. There is also a provision for a sinking fund to be set aside each year out of the net profits, before the payment of dividends, sufficient for the redemption of the bonds at maturity. In addition to the payment of interest, the corporation promises to pay to the holder of the bond a dividend on the face value of the instrument at a rate equal to the rate of the dividend paid on the capital stock of the company up to and including 14 per cent per annum.

On October 20, 1916, George Thomson brought this suit against both the corporation and Reynolds to rescind the sale and recover the money paid for the bonds and stock. The plaintiff avers in his complaint that he was induced to purchase the bonds and stock by fraudulent representations made by the defendant and relied upon by the plaintiff. It is specifically alleged in the complaint that the defendant

"fraudulently represented to this plaintiff that the bonds of the defendant corporation were guaranteed 6 per cent (6%) bonds which were secured by the real property belonging to the defendant corporation; that the real property of the defendant corporation was free and clear of mortgages; that the corporation property was worth $1,000 per acre; that the corporation had twenty (20) shares of its capital stock which someone had failed to purchase according to his contract, which the corporation would give to this plaintiff if this plaintiff purchased the bonds; that said stock was of great value; that the defendant corporation owned so much land free and clear of mortgages that the purchase of the bonds would be a sure investment;

that the company was setting aside each year sufficient money as a sinking fund to insure the redemption of the bonds at maturity.''

The defendants answered jointly and denied that they were guilty of fraud; and as a separate defense they alleged that Thomson ratified the purchase by participating in four several meetings of bondholders and stockholders which were called and held on June 10, July 18, July 25 and August 15 in 1916 in the manner provided by the by-laws of the corporation. A trial terminated in a decree for the plaintiff and the defendants appealed. George Thomson died and George F. Brice, as administrator, was substituted as the party plaintiff.                          REVERSED.

For appellants there was a brief over the names of *Mr. Jay Bowerman, Mr. Fred L. Olson* and *Mr. W. H. Fowler,* with an oral argument by *Mr. Bowerman.*

For respondent there was a brief over the names of *Messrs. Brice & Masters* and *Mr. Wm. A. Williams,* with oral arguments by *Mr. Geo. F. Brice* and *Mr. Williams.*

HARRIS, J.—H. R. Reynolds purchased 335 acres of land from the late H. W. Scott. Reynolds had investigated various cemeteries in different parts of the United States and his purpose was to prepare and maintain a modern, well-equipped cemetery. The price was $300 per acre, totaling $100,500 for the entire tract. Reynolds made an initial payment of $20,000 and the remainder was to be paid at times and in amounts not disclosed by the record. At some time, not definitely shown by the testimony, but probably in 1909, Reynolds transferred his interest in the contract to the Mt. Scott Park Cemetery Corporation, which

presumably had been organized for the purpose of taking over the property. The corporation was capitalized at $500,000. The capital stock was delivered to Reynolds in payment for his interest in the land. The corporation issued and sold bonds. A corporation organized by Reynolds was made the selling agent for the bonds. Each of the bonds contained a stipulation as follows: "This issue of bonds shall be limited to the amount of $300,000." The company caused its bonds to be sold and it used the proceeds in making payments on the land contract until the amount due was reduced to $42,500. At some time, not definitely appearing in the record, but after the amount due on the contract had been reduced to $42,500, the corporation secured a deed to the land and gave a mortgage for the $42,500, the balance due on the purchase price. The corporation continued to sell bonds and "continued on putting this money into the cemetery, developing it and preparing it later for sale." At some subsequent time, not made certain by the testimony, the Scott mortgage, after having been reduced by partial payments to $28,000, was paid, and then the corporation "negotiated another mortgage of $28,000." An additional $7,500 was borrowed for the purpose of building a crematorium and this money was also secured by a mortgage. We infer from the record that when Thomson purchased the bonds and stock only a part of the land, about 35 acres, was being developed for cemetery purposes. In October, 1911, the corporation owed $28,000 either on the Scott mortgage or on the subsequent mortgage which was negotiated for that amount; and we infer, too, that the mortgage for $7,500 was also in effect at that time. In a word, the corporation owed approximately $35,000 when it sold the bonds and stock to Thomson

and this indebtedness was secured by mortgages. However, these mortgages did not cover the 35-acre tract which was being developed for cemetery purposes, although they did embrace the remaining 300 acres. The bonds were not secured by a mortgage or a trust deed. We understand from the evidence that the corporation desired to keep the 35-acre tract free from encumbrances so as to avoid the necessity of securing releases whenever lots were sold. In this connection it is appropriate to direct attention to what Reynolds testified concerning the stipulation in the bonds for the payment of a dividend equal to the dividend paid on the stock. He explained that because of the fact that no mortgage or trust deed had been given as security the corporation

"decided to put in a profit sharing feature which enabled the bondholder in addition to receiving his 6 per cent interest, to participate in the profits which might come to the cemetery in the excess of interest to the extent of 14 per cent"; and hence this "would make it a liberal bond more in the nature of an investment; make it more liberal than a mere interest-bearing proposition."

Such was the situation when Thomson purchased the bonds and stock in October, 1911.

Interest was promptly paid to and received by Thomson for the years 1912, 1913 and 1914. Some difficulty was experienced, however, in obtaining the interest which became due on January 1, 1916, for the year 1915. Thomson placed the matter in the hands of his attorney who subsequently collected the money for Thomson. In 1917 the interest for the year 1916 was tendered to Thomson, but he refused to accept it.

Meetings of the bondholders and stockholders were held on June 10, July 18, July 25 and August 15 in

1916; and, with one possible exception, Thomson not only attended but voted at each of those meetings. The bondholders, presumably at one of those meetings, appointed a committee; and we infer that this committee made certain recommendations to the corporation, for it appears that, acting on the recommendations of the committee, the corporation obtained authority to decrease its capital stock to $60,000. We are also justified in inferring that the corporation, acting on the recommendation of the committee selected by the bondholders, authorized and executed a mortgage to secure the outstanding bonds. A circular letter was addressed to bondholders advising them of what had been done and requesting them to present their bonds so that the instruments could be registered and stamped. The circular also recited that stock had been given to bondholders as a bonus and the holders of such stock were requested to return their certificates. The bondholders were informed by the circular letter that

"The new capitalization of $60,000 goes into the Treasury and will be issued only to those who have paid cash or its equivalent while the bondholders will receive, in new stock 6 per cent of face value of their bond, the same to be given in payment of interest due January 1st, 1915. The balance of this stock will remain in Treasury as a Company asset."

Thomson refused to comply with the request contained in the circular; and afterwards he commenced this suit by filing his complaint and bringing the stock and bonds into court for the corporation.

1. If it be assumed that Reynolds made any of the statements, ascribed to him in the transcript of testimony, concerning the value of the land or the shares of stock, the most that can be said of such statements

is that they were mere expressions of opinion and did not amount to representations of facts.

Reynolds admits that he told Thomson that "it was a good safe investment"; and we may add that the witness still insisted at the trial that it was in truth a good investment. The record does not tell us how many lots have been sold, but the transcript of testimony does disclose that lots have been and are being sold at a price per square foot amounting to $30,000 per acre. The record is silent as to the amount of outstanding bonds.

2. We cannot say, after reading and re-reading the evidence, that Reynolds made any representations concerning the safety of the investment which would warrant a rescission of the sale.

Reynolds denied that he made any representations about a sinking fund. Thomson testified that he

"understood that these bonds would be paid off as they would run to a valuation of a dividend of 14 per cent. That they would be paid off, that they were setting off a dividend of 4 per cent to meet these bonds at the time that they would come up to that amount." Mrs. Thomson stated that Reynolds "gave us to understand that there was a sinking fund, and I didn't know at that time what a sinking fund was, and I was wondering what a sinking fund was, until I found out that it was money that was put up to pay these bonds off as they were called in."

When Reynolds negotiated the sale he had with him a blank bond which he read to Thomson and to Mrs. Thomson. Attention has already been called to the provision, contained in each bond, concerning the sinking fund. By this provision the corporation "promises to set aside each year, out of its net profits, before the payment of any dividends" a fixed sum for the redemption of the bonds. The bond, on its face,

plainly told Thomson exactly what the corporation agreed to do concerning a sinking fund.

3. The record does not show that the promise has been broken; nor has it been satisfactorily shown that Reynolds made any fraudulent statements about the sinking fund. The plaintiff has not submitted sufficient evidence to warrant a rescission of the sale on account of any statements made about the sinking fund. The remaining allegations of fraud relate to the averment that Reynolds represented that the bonds were secured by the real property owned by the corporation and that the land was free from encumbrances.

The cemetery is located in or near Portland. Thomson was in McMinnville when he purchased the stock and bonds. In 1912 Thomson visited the cemetery property and in company with Reynolds walked "all over it" and according to the testimony of the former, Reynolds "told me that there was a mortgage on" the property and also "told me then that there was 35 acres would sell and would pay off all the little indebtedness that was on it. That didn't bother me much." When asked, "did he tell you that the mortgage was on the 35 acres or that the mortgage was on the land other than the 35 acres?" Thomson answered thus: "He didn't say. He just said there was a small mortgage on the Mt. Scott property, but that the 35 acres would sell for more than the mortgage amounted to."

Thomson admitted that he attended the meeting which the stockholders and bondholders held on June 10, 1916, but he denied that he said anything at the meeting. A. W. Person, a stenographer and the court reporter in Department No. 3 of the Circuit Court for Multnomah County, was employed by Reynolds to at-

tend and report the proceedings of that meeting.   So far as material here the stenographer's notes of what occurred at the meeting read as follows:

"Mr. Thomson: Mr. Chairman, might I get the floor a few minutes?   I think we are away off of the business the meeting was called for at the time.   Mr. Reynolds is away off.   I think the main thing that this meeting was called for was to see if we were going to get our twenty year notices or bonds, or whatever you might call them, secured so as to be paid without any other trouble.   That is what this meeting was called for.

"Mr. Reynolds: We will get to that in a few minutes.

"Mr. Thomson: And I have got a good piece to go home.

"Mr. Reynolds: I know you have, Mr. Thomson.

"Mr. Thomson: And I haven't got anything against Mr. Reynolds, or any other person, but just to carry out the will of the meeting, of Mr. Reynolds or any other person that can give us satisfaction that we can be secured without these mortgages being coming in before our bonds.

"A voice: You can't do it.

"Mr. Thomson (Continuing): Except the thirty-five or forty thousand that was on the indebtedness of the place before the bonds were given that would be ahead of the bonds, and Mr. Reynolds said when he got my money that the bonds was the next things that would be paid.

"Mr. Reynolds: That is right."

4. When we remind ourselves that Mr. Thomson was 84 years of age, we must conclude that he had simply forgotten what had occurred at the meeting held on June 10, 1916, for it seems to us that there can be no reasonable escape from the conclusion that he did in truth make the statements ascribed to him by the stenographer.   The concluding statement made by Mr. Thomson at the meeting is highly significant;

and it may be noted, too, that Reynolds confirmed the statement by saying "that is right." If, when he sold the bonds and stock, Reynolds told Thomson that the corporation owed thirty-five or forty thousand dollars and that this indebtedness "would be ahead of the bonds," then the plaintiff must fail. If on the other hand Reynolds represented to Thomson that there were no encumbrances on the land and that the bonds were secured by a mortgage then the plaintiff must nevertheless fail when we remember that Thomson learned in 1912 that there was a mortgage on the property, that Thomson accepted interest for four years, that he unquestionably knew at some time, either at or before the meeting held on June 10, 1916, that the bonds were not secured by a mortgage and that there was a prior indebtedness of $35,000 or more against the property. If Reynolds told Thomson the truth the latter cannot complain. If Reynolds did not tell Thomson the truth it was the duty of the latter, upon learning the truth, to act promptly and return or offer to return what he had received: *Scott* v. *Walton,* 32 Or. 462, 464 (52 Pac. 180). If Thomson's first information about the indebtedness was obtained in 1912 then we find him receiving interest for four years before attempting to rescind. If he first learned of the indebtedness shortly before or even during the meeting of June 10, 1916, then we find him treating the stock and bonds as his own at three subsequent meetings which he attended and in which he participated: *Mills* v. *Campbell,* 87 Or. 690, 694 (170 Pac. 298, 171 Pac. 565).

For aught that appears in the record the bonds may be worth all that was paid for them; and, indeed, the only evidence directly referring to the value of the bonds is to the effect that they are worth their face

value. From what has been said it follows that the decree appealed from must be and the same is reversed and the suit is dismissed, but we conclude that, all things considered, it is equitable to enter a decree without costs against the plaintiff.

REVERSED.     SUIT DISMISSED.

BEAN, BURNETT, and BENSON, JJ., concur.